UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------x
CROWN CASTLE NG EAST INC.,

                              Plaintiff,

                                                                    **OPINION AND ORDER**

        - against -
                                                                    No. 12-CV-6157 (CS)

TOWN OF GREENBURGH, NEW YORK, and TOWN
BOARD OF THE TOWN OF GREENBURGH, NEW YORK,

                              Defendants.
-------------------------------------------------------------------x

<u>Appearances</u>:
T. Scott Thompson
Elizabeth A. Drogula
Davis Wright Tremaine LLP
Washington, District of Columbia

Lacy H. Koonce, III
Davis Wright Tremaine LLP
New York, New York
*Counsel for Plaintiff*

Andrew D.H. Rau
James C. Dalton
Amanda J. Sundquist
Unruh, Turner, Burke & Frees, P.C.
West Chester, Pennsylvania
*Counsel for Defendants*

<u>Seibel, J.</u>

        Plaintiff Crown Castle NG East Inc., and its predecessor in all relevant interests, NextG

Networks of NY, Inc., sought permission to install a Distributed Antenna System ("DAS") in the

Town of Greenburgh, New York ("Town").  The Town, after a protracted negotiation/

application process, denied Plaintiff's applications.  Plaintiff brought this action seeking

declaratory and injunctive relief under 47 U.S.C. §§ 253, 332(c)(7)(B)(ii), and 332(c)(7)(B)(iii),

provisions of the Federal Telecommunications Act of 1996 ("TCA"), Pub. L. No. 104-104, 110 Stat. 56.  Before the Court are Defendants' Motion to Dismiss the First Amended Complaint, (Doc. 27), and Plaintiff's Motion for Summary Judgment, (Doc. 32).  The TCA requires expedited treatment of actions brought under Section 332(c)(7), *see* 47 U.S.C. § 332(c)(7)(B)(v), and thus, upon completion of the parties' briefing, I have taken up the Motions out of turn.  For the following reasons, Defendants' Motion is GRANTED IN PART and DENIED IN PART and Plaintiff's Motion is GRANTED IN PART and DENIED IN PART.

## I.  BACKGROUND

For purposes of Defendants' Motion to Dismiss, I accept as true the facts, but not the legal conclusions, as set forth in Plaintiff's First Amendment Complaint for Declaratory and Injunctive Relief and Request for Expedited Treatment ("FAC"), (Doc. 25).  For purposes of Plaintiff's Motion for Summary Judgment, I resolve all factual disputes in favor of the Defendants as non-moving party.  In any event, the relevant facts are largely undisputed; I will specifically note where they are not.

### A.  The Parties

Plaintiff is a "carrier's carrier that designs and installs fiber-optic based networks to improve wireless coverage and capacity."  (P's 11/13/09 Letter Encl. 5, at 41.)[1]  Plaintiff does so by installing a DAS in a given area – that is, a system consisting of "[n]odes," each having a "small, low-power antenna, laser and amplifier equipment for the conversion of RF [*i.e.*, radio

---

[1] "P's 11/13/09 Letter" refers to the Letter from Peter Broy, Director of Government Relations, NextG Networks of NY, Inc., to Paul Feiner, Supervisor, Town of Greenburgh (Nov. 13, 2009), which was provided as Exhibit 1 to the to the Declaration of Peter D. Heimdahl in Support of Crown Castle NG East Inc.'s Motion for Summary Judgment ("Heimdahl Decl."), (Doc. 39).  Enclosure 5 to P's 11/13/09 Letter is titled Introductory Power Point, and is apparently a slide deck prepared by Plaintiff as part of a pitch to the Town.  Because the Heimdahl Declaration attaches 38 exhibits, some of which are multipage documents which themselves include exhibits, and which are not all consecutively paginated, when I refer to page numbers of exhibits to the Heimdhal Declaration, I refer to the page numbers generated by the Court's ECF system.

frequency] signals to optical signals (and vice versa, *i.e.*, from optical to RF), that is connected to the antenna, fiber optic lines, and associated equipment such as power supplies."  (FAC ¶ 11.)  A DAS expands wireless coverage of a given provider by a so-called "handoff and transport," (*id.* ¶ 10) – that is, receiving an RF signal from a wireless customer (*e.g.*, a mobile phone user) at a node antenna (the handoff), converting the RF signal to an optical signal and transporting it through Plaintiff's fiber optic lines to another site (the transport), and returning the optical signal to the wireless service provider for either routing elsewhere or interconnection with the public telephone network, (*see id.* ¶ 12; *see also* P's 56.1 ¶¶ 7-10).[2]  In other words, Plaintiff's DAS can provide a wireless provider with a conduit from a mobile phone user to the provider's network, thereby extending that network without the provider erecting a cell tower in the area.

Plaintiff is not itself a commercial mobile radio service ("CMRS") or a wireless service provider.  (P's 56.1 ¶ 14.)  It has, however, obtained a certificate of public convenience and necessity ("CPCN") from the New York State Department of Public Service "to operate in New York State as a facilities-based provider and reseller of telephone service, <u>without</u> authority to provide local exchange service."  (Delsman Decl. Ex. 1, at 1 (emphasis in original).)[3]  Although Plaintiff's proposed DAS is intended to initially serve one customer, MetroPCS, (Determination 12),[4] it will apparently be able to accommodate more, (*see* FAC ¶ 9; Ds' Eng'g Report 4 ("[I]t may be possible for the system to accommodate another carrier at a similar frequency in the future."); Ds' Supp. Eng'g Report 1-2 ("[I]t is possible that additional wireless carriers may

---

[2] "P's 56.1" refers to Plaintiff's Statement of Material Facts.  (Doc. 32-1.)  "Ds' 56.1" will refer to Defendants' Response and Counterstatement of Material Facts Pursuant to Local Civil Rule 56.1(b).  (Doc. 56.)  I will refer only to P's 56.1 where the material fact has been expressly admitted, or is deemed admitted because of a failure to cite admissible evidence that controverts the material fact.  *See* Local Civ. R. 56.1(d).

[3] "Delsman Decl." refers to the Declaration of Robert L. Delsman in Support of Crown Castle NG East Inc.'s Motion for Summary Judgment.  (Doc. 35.)

[4] "Determination" refers to the Town Board's Determination, *NextG Networks of NY, Inc.* (Town Bd. of Town of Greenburgh, N.Y. July 24, 2012).  (FAC Ex. 1.)

utilize NextG's DAS system in the future should the application be approved and equipment installed.")).[5]

The Town of Greenburgh is a municipality in Westchester County, New York, which consists of a number of incorporated villages and an unincorporated section of less than twenty square miles.  (*See* Ds' 56.1 ¶ 28.)  Plaintiff seeks to locate the nodes for its proposed DAS on Town-owned rights-of-way within the unincorporated section of Greenburgh.  (*See* P's 56.1 ¶ 29.)

B.  The Application Process

1.  Getting to the Antenna Review Board

a.  Plaintiff's Initial Request for a Right of Way Use Agreement

On November 13, 2009, Plaintiff submitted a letter to the Town Supervisor with the subject line "Application for License Agreement between the Town of Greenburgh and NextG Networks for Use of the Public Rights-of-Way," stating that the letter was being "submitted to the Town in accordance with Section 253 of the [TCA] and the relevant New York statutes governing the use of the public way by telecommunications carriers for the provision of their services."  (P's 11/13/09 Letter 1.)[6]  It attached a proposed "Right of Way Use Agreement" ("RUA"), (*see id.* at 14-36), which would "authorize the installation and operation of [Plaintiff's] equipment and network in, under, and over the public ways of the Town," (*id.* at 2), and would give the Town compensation for the same, (*see id.* at 3).  The letter made clear the preliminary

---

[5] "Ds' Eng'g Report" refers to the Technical Review Report dated December 14, 2011 prepared by Michael P. Musso, P.E., Senior Project Engineer, Henningson, Durham & Richardson Architecture and Engineering, P.C., in association with HDR Engineering, Inc., and issued to the Supervisor and Members of the Town Council of the Town of Greenburgh.  (Heimdahl Decl. Ex. 28.)  "Ds' Supp. Eng'g Report" refers to the HDR Technical Review – Supplemental Memorandum dated February 23, 2012 prepared by Michael P. Musso, and issued to the Supervisor and Members of the Town Council of the Town of Greenburgh.  (Heimdahl Decl. Ex. 32.)

[6] The FAC characterizes the November 13, 2009 Letter as Plaintiff's "first application for authorization to deploy its telecommunications facilities in the Town's public rights of way."  (FAC ¶ 30.)

nature of the request.  (*See id.* ("[T]he design [of the proposed DAS] is not yet finalized to the point where NextG can specify the exact Town-owned poles that it would like to use.").)  The letter further suggested that Plaintiff's "voluntary application" under Section 253 was not legally necessary.  (*See id.* at 3-4.)  Plaintiff requested a response from the Town within 30 days, stating that in the absence of a response it would "assume that the Town *does not* wish to proceed with an agreement."  (*Id.* at 4 (emphasis in original).)  The Town apparently ignored the letter.  (*See* P's 56.1 ¶ 25.)

Several months later, Plaintiff followed up with a letter stating that it assumed the Town did not wish to proceed with the agreement proposed in Plaintiff's first letter, and indicating that Plaintiff would "soon be making an application for permits pursuant to Article II, § [*sic*] 430 *et seq.* of the Town of Greenburgh code."[7]  (P's 1/29/10 Letter 1-2.)[8]  The letter specifically referred to time limits for processing applications set forth in the so-called *Shot Clock Order* of the Federal Communications Commission ("FCC"),[9] and requested that "its site-specific

---

[7] Article II of Chapter 430 of the Town of Greenburgh Code ("Town Code") is entitled "Street Excavations and Temporary Street Obstructions."  It requires a permit from the Department of Public Works before anyone can "erect or cause to be erected any pole for public utility purposes, any pole or signpost for any other purpose or any other structure above or below ground; or string any wires, cables, chains or ropes; or install any pipes, conduits, vaults, fixed boxes or other containers or other appurtenances or equipment of any kind."  Town of Greenburgh, N.Y., Code § 430-2(A)(1).  It further requires that such application "be made, in writing, to the Commissioner, upon an application form containing such information as the Commissioner may specify, together with three copies of a sketch or plans showing the proposed work as well as existing conditions in detail."  *Id.* § 430-3(A).

[8] "P's 1/29/10 Letter" refers to the Letter from Peter Heimdahl, Senior Director of Government Relations, NextG Networks of NY, Inc., to Paul Feiner (Jan. 29, 2010).  (Heimdahl Decl. Ex. 2.)

[9] *See Petition for Declaratory Ruling* (*Shot Clock Order*), 24 F.C.C. Rcd. 13994 (2009), *aff'd sub nom. City of Arlington, Tex. v. FCC*, 668 F.3d 229 (5th Cir. 2012), *aff'd*, 133 S. Ct. 1863 (2013).  In its *Shot Clock Order*, the FCC interpreted the "reasonable period of time" language in 47 U.S.C. § 332(c)(7)(B)(ii) to presumptively mean "90 days to process personal wireless service facility siting applications requesting collocations, and . . . 150 days to process all other applications," such that a "failure to act" under 47 U.S.C. § 332(c)(7)(B)(v) would occur after this period expires.  *Id.* at 14005.  The FCC recognized, however, that these presumptively reasonable periods could be extended "by mutual consent of the personal wireless service provider and the State or local government."  *Id.* at 14013.  The FCC further noted that "the time it takes for an applicant to respond to a request for additional information will not count toward the 90 or 150 days," but "only if that State or local government notifies the applicant within the first 30 days that its application is incomplete."  *Id.* at 14015.

application under the code . . . for a permit as outlined in § 430-3.A" be processed within those time limits.  (*Id.* at 2.)

        b.  <u>Plaintiff's Chapter 430 Application</u>

On March 25, 2010, Plaintiff submitted to the Town's Commissioner of Public Works what it dubbed "Permit Applications for NextG Networks of NY, Inc.," seeking permission under Chapter 430 of the Town Code "to install telecommunications/utility equipment, together with associated fiber, on one (1) new utility pole to be installed by NextG in the Town right-of-way and twenty (20) existing utility poles, pursuant to plans attached hereto."  (P's 3/25/10 Letter 1.)[10]  In its letter, Plaintiff stated that it was a "duly certificated and regulated utility company," and noted that its application materials were not being submitted on the form required by Section 430-3(A) of the Town Code because it and its contractor "made several good faith attempts to obtain this form from [the Town's] department staff on March 22, 2010 without success."  (*Id.* at 1-2.)[11]  The Town and Plaintiff met on March 30, 2010 to discuss the March 25, 2010 Letter.  (*See* P's 6/7/10 Letter 1.)[12]

Apparently having received no response after 30 days, Plaintiff sent a follow-up letter to the Commissioner of Public Works asserting that, because the Town had not indicated that Plaintiff's Chapter 430 Application was incomplete within 30 days of its submission, the application "is now deemed complete by operation of default."[13]  (P's 4/27/10 Letter 1 (citing

---

[10] "P's 3/25/10 Letter" refers to the Letter from Peter D. Heimdahl to Victor Carosi, P.E., Commissioner of Public Works, Town of Greenburgh (Mar. 25, 2010).  (Heimdahl Decl. Ex. 3.)

[11] Defendants dispute that Plaintiff "made several good faith attempts to retain [*sic*] the application form referenced by Section 430-3.A on March 22, 2010."  (Ds' 56.1 ¶ 31.)

[12] "P's 6/7/10 Letter" refers to the Letter from Peter D. Heimdahl to Victor Carosi, P.E. and John Lucido, Building Inspector, Town of Greenburgh (June 7, 2010).  (Heimdahl Decl. Ex. 4.)

[13] This appears to be a misstatement of the *Shot Clock Order*, which says only that for any part of the 90- or 150-day period to be excluded on the ground of the incompleteness of the application, the locality must so notify the applicant within 30 days.  *See Shot Clock Order*, 24 F.C.C. Rcd. at 14015.  The *Shot Clock Order* says nothing about a failure to provide such notice operating as a default.

*Shot Clock Order*, 24 F.C.C. Rcd. at 14015).)[14]  Plaintiff went on to "remind" the town of the time periods to process the application under the *Shot Clock Order*, and to reiterate that it remained open to negotiating an RUA or the like with the Town.  (*Id.* at 1-2.)  As of June 7, 2010 – 74 days after Plaintiff's March 25, 2010 Letter – the Town had yet to respond.  (*See* P's 56.1 ¶ 35.)[15]

Plaintiff sent a follow-up letter on June 7, 2010 to both the Commissioner of Public Works and the Building Inspector expressing concern about the Town's silence, and stating that it would "assume that the Town concurs that no permits or authorizations are required for the attachments" if no response was received within the *Shot Clock Order* time period.  (*See* P's 6/7/10 Letter 1-2.)  Although the Commissioner of Public Works did not respond to this letter, (P's 56.1 ¶ 36), the Building Inspector, who apparently received it on June 15, did respond, indicating that he was forwarding Plaintiff's April 27, 2010 Letter to the Town's Antenna Review Board ("ARB") for processing under the Town's Antenna Law,[16] (Ds' 6/15/10 Letter).[17]

---

[14] "P's 4/27/10 Letter" refers to the Letter from Joshua S. Trauner, Director of Government Relations, NextG Networks of NY, Inc., to Victor Carosi, P.E. (Apr. 27, 2010), which was provided as Exhibit 1 to the Declaration of John Cavaliere in Support of Crown Castle NG East Inc.'s Motion for Summary Judgment, (Doc. 36).

[15] In their response to Plaintiff's proposed material fact, Defendants do not dispute that the Town did not so respond, nor do Defendants cite any evidence suggesting that the Town did.  (*See* Ds' 56.1 ¶ 35.)

[16] The Town's Antenna Law, discussed in more detail below, *see infra* Part II.E, was enacted "[i]n order to encourage the siting of personal wireless services facilities in nonresidential areas and to protect, to the maximum extent permitted local governments by the [TCA] and the [FCC], the aesthetics, the suburban character of the Town of Greenburgh, the property values of the community, the health and safety of citizens and a citizen's ability to receive communications signals without interference from other communications providers, while not unreasonably limiting competition among communications providers or unreasonably limiting reception of receive-only antennas."  Town of Greenburgh, N.Y., Code § 285-37(A).  It establishes a specific procedure under which applications for permission to install any antennae in the Town are processed, including a preliminary review by the ARB for completeness of the application, and a subsequent substantive review.  *See id.* § 285-37(A)(1).

[17] "Ds' 6/15/10 Letter" refers to the Letter from John Lucido to Peter Heimdahl (June 7, 2010).  (Heimdahl Decl. Ex. 5.)

2.   Completeness Proceedings Before the Antenna Review Board

     a.   The June 28, 2010 Meeting

On June 16, 2010, Catherine Lederer-Plaskett, the Chairperson of the ARB, issued a notice of a public hearing to be held on June 28, 2010 at which the ARB was to "review an application from MetroPCS" and to provide "a review of the application process for [Plaintiff]." (Ds' Ex. D-3.)[18]  Plaintiff's attorney attended this meeting, at which the ARB reviewed the antenna application process.  (P's 56.1 ¶ 39; *see* Ds' 6/29/10 Letter.)[19]  The next day, the Chairperson sent a letter to Plaintiff indicating that its materials "do not constitute an application" under Section 285-37(A)(16) of the Town Code[20] and that "an application is needed for each site and all application materials for a site must be submitted as a cohesive report."  (Ds' 6/29/10 Letter.)

     b.   The July 20, 2010 Meeting and Plaintiff's July 22, 2010 Letter

On July 20, 2010, Peter Heimdahl, Plaintiff's Senior Director of Government Relations, met with the Town's Building Inspector and Thomas Madden, the Commissioner of the Town's Department of Community Development and Conservation, regarding the materials submitted to the Town.  (P's 56.1 ¶ 40.)  Plaintiff later disputed that the Town's Antenna Law applied to it as a "regulated public utility . . . seeking to conduct business in the Town's public ways," but agreed to an analysis under the Antenna Law as to whether its proposed facilities could be

---

[18] "Ds' Ex. D-__" refers to exhibits that Defendants provided along with their Rule 56.1 response.  (Doc. 56-1.)  Although it is not clear that these documents would be admissible in evidence – for example, they were not submitted with a declaration or affidavit made on personal knowledge – and although inadmissible evidence cannot be the basis for defeating a summary judgment motion, *see Major League Baseball Props., Inc. v. Salvino, Inc.*, 542 F.3d 290, 310 (2d Cir. 2008), I nevertheless rely on some of these documents for narrative purposes.  Plaintiff does not seem to dispute their authenticity.  Furthermore, as to Ds' Ex. D-3, Plaintiff admits that it attended the June 28, 2010 meeting.

[19] "Ds' 6/29/10 Letter" refers to the Letter from Catherine Lederer-Plaskett, Chairperson, Antenna Review Board, Town of Greenburgh, to Joshua S. Trauner (June 29, 2010).  (Heimdahl Decl. Ex. 6.)

[20] "All applications for the installation of a communications facility [*i.e.*, antennae] shall be submitted to the Building Inspector and shall include a report containing the information and certifications hereinafter set forth."  Town of Greenburgh, N.Y., Code § 285-37(A)(16).

classified as "as-of-right" under Section 285-37(A)(8) of the Town Code;[21] if so characterized, Plaintiff agreed to a review by the ARB for aesthetic considerations.  (*See* P's 7/22/10 Letter.)[22] Madden responded to Plaintiff's letter – which included detailed siting proposals – with an e-mail indicating that most of the proposed sites were "as-of-right."  (Ds' 8/6/10 E-mail.)[23]

  c. Plaintiff's September 2010 Section 285-37(A)(8) Application

  On September 8, 2010, Plaintiff submitted to the Building Inspector "an application for permits, if so required, pursuant to § 285-37A *et seq.* . . . . to install telecommunications/utility equipment, together with associated fiber, on one (1) new utility pole to be installed by NextG in the Town right-of-way and fourteen (14) existing utility poles, pursuant to plans, required information, and Town application forms attached hereto."  (P's 9/8/10 Letter 1.)[24]  Relying on Madden's August 6, 2010 E-mail, Plaintiff sought "as-of-right" treatment of its application.  (*See id.*)[25]  Plaintiff also noted that the technical information it was providing in accordance with the Antenna Law was based on studies performed at a Long Island site with "the same equipment and specification as the equipment NextG hereby submits to the Town under this application." (*Id.* at 2.)

  On September 10, 2010, the Building Inspector acknowledged receipt of Plaintiff's application and forwarded it to the ARB for a completeness review, but also indicated that his

---

[21] If a proposed location is "as-of-right," the applicant need only meet the conditions imposed by the ARB based on aesthetic and visual considerations.  *See* Town of Greenburgh, N.Y., Code § 285-37(A)(8).  Otherwise, an applicant must obtain a special permit from the Town Board (if on Town-owned property) or the Zoning Board of Appeals (if not).  *See id.* § 285-37(A)(9).

[22] "P's 7/22/10 Letter" refers to the Letter from Peter D. Heimdahl to Thomas Madden, AICP, Commissioner, Town of Greenburgh Department of Community Development and Conservation, and John Lucido (July 22, 2010). (Heimdahl Decl. Ex. 7.)

[23] "Ds' 8/6/10 E-mail" refers to the E-mail from Thomas Madden to Peter Heimdahl and Mark Weingarten, DelBello Donnellan Weingarten Wise & Wiederkehr, LLP (Aug. 6, 2010).  (Heimdahl Decl. Ex. 8.)

[24] "P's 9/8/10 Letter" refers to the Letter from Peter D. Heimdahl to John Lucido (Sept. 8, 2010).  (Heimdahl Decl. Ex. 9.)

[25] Defendants do not dispute that Madden deemed the sites so, only whether he had the authority to make such a determination officially.  (*See* Ds' 56.1 ¶ 44.)

department "does not accept applications for work performed in the Town's right-of-way" and asked Plaintiff to forward the application and fees to the Commissioner of the Department of Public Works.  (Ds' 9/10/10 Letter.)[26]  Within 30 days of this submission, the Chairperson of the ARB rejected Plaintiff's Section 285-37(A)(8) Application.  (Ds' 10/1/10 Letter ("The materials submitted do not constitute an application in accordance with the Town's Antenna Law.").)[27]  In her rejection letter, the Chairperson did not set forth in what respects the application was deficient, but invited further communication on the subject by phone or in person.  (*See id.*)

The Chairperson also informed Plaintiff (by telephone on October 5, 2010) that Madden had no authority to determine whether its proposed sites qualified for "as-of-right" treatment, (*see* P's 56.1 ¶ 51; Ds' 56.1 ¶ 51), and soon thereafter, the Building Inspector informed Plaintiff that none of its proposed sites qualified as "as-of-right" locations, (*see* P's 56.1 ¶ 53).  The next day, Plaintiff forwarded Madden's August 6, 2010 E-mail to the ARB (presumably to show what it considered a prior "as-of-right" determination by the Town), and requested sample applications deemed acceptable by the ARB.  (P's 10/19/10 E-mail.)[28]

d.  Plaintiff's November 2010 Section 285-37(A)(9) Applications

On November 23, 2010, Plaintiff submitted a second round of Section 285-37 applications, this time for all 21 proposed sites, seeking a special permit under Section 285-37(A)(9).  (*See* P's 11/23/10 Letter.)[29]  The ARB reviewed these applications at a public meeting on December 14, 2010.  (Heimdahl Decl. Ex. 14, at 2; P's 56.1 ¶ 55.)  The record is unclear as to

---

[26] "Ds' 9/10/10 Letter" refers to the Letter from John Lucido to Peter D. Heimdahl (Sept. 10, 2010).  (Heimdahl Decl. Ex. 10.)

[27] "Ds' 10/1/10 Letter" refers to the Letter from Catherine Lederer-Plaskett to Peter D. Heimdahl (Oct. 1, 2010).  (Heimdahl Decl. Ex. 11.)

[28] "P's 10/19/10 E-mail" refers to the E-mail from Peter D. Heimdahl to Carole Walker, Secretary to the Antenna Review Board, Town of Greenburgh (Oct. 19, 2010).  (Heimdahl Decl. Ex. 12, at 2-3.)

[29] "P's 11/23/10 Letter" refers to the Letter from Joshua S. Trauner to John Lucido (Nov. 23, 2010).  (Heimdahl Decl. Ex. 13.)

what happened at this meeting.  Plaintiff alleges that no action was taken then.  (FAC ¶ 51; P's 56.1 ¶ 55.)  Defendants assert that the ARB advised Plaintiff of numerous deficiencies in its applications under Section 285-37(A)(16).  (*See* Ds' 56.1 ¶ 55; Lederer-Plaskett Decl. ¶ 19.)[30]

Following the December 14, 2010 meeting, Plaintiff, along with members of the ARB and Councilman Francis Sheehan (the Town Board's liaison to the ARB), went on site visits to review Plaintiff's proposed locations.  (P's 56.1 ¶ 56.)  Plaintiff alleges that as a result of these visits, it agreed to shift four of its proposed locations to sites preferred by the ARB.  (*Id.*; FAC ¶ 51.)  Defendants, not inconsistently, assert that these new locations were not "as-of-right."  (Ds' 56.1 ¶ 56.)

On February 8, 2011, Plaintiff sent a letter to the Town Attorney (copying most Town officials involved with the process) again asserting that the Town's Antenna Law should not apply to its proposed "installation of public utility equipment in the Town's public right-of-way," but requesting relief from strict compliance with certain provisions of the Antenna Law, to the extent it did apply, such as those requiring vicinity maps showing most or all nearby structures within 1500 feet of the proposed installation.  (*See* P's 2/8/11 Letter 1-2 (referencing Town of Greenburgh, N.Y., Code § 285-37(A)(16)(q)-(r)).)[31]  The Town Attorney apparently never responded.

e.  <u>Plaintiff's March 2011 Template Application and Subsequent Revisions</u>

On March 15, 2011, Plaintiff submitted to the ARB a single "template" application, the purpose of which was to ease the burden on both parties by allowing them to focus the completion review on only one application initially.  (P's 56.1 ¶ 60.)  The ARB first reviewed

---

[30] "Lederer-Plaskett Decl." refers to the Declaration of Catherine Lederer-Plaskett in Opposition to Crown Castle, NG East Inc.'s Motion for Summary Judgment.  (Doc. 55.)

[31] "P's 2/8/11 Letter" refers to the Letter from Peter D. Heimdahl to Timothy Lewis, Esq., Town Attorney, Town of Greenburgh (Feb. 8, 2011).  (Heimdahl Decl. Ex. 15.)

the template application at a public meeting held on April 4, 2011, at which time the ARB identified numerous deficiencies in it. (*Id.* ¶ 61.) On April 7, 2011, the Chairperson of the ARB issued an incompleteness letter, which again did not set forth the specific respects in which the template application was deficient. (Heimdahl Decl. Ex. 22, at 1.)

Thus began a series of revisions. The first set, (*see* P's 56.1 ¶ 65 (5/9/11, six applications); *id.* ¶ 67 (5/16/11, seven applications)), was addressed at a public ARB meeting held on May 17, 2011, (*id.* ¶ 68). Again, the ARB identified alleged deficiencies. (*Id.* ¶ 69.) The second set of revisions was discussed at a public ARB meeting held on June 27, 2011. (*Id.* ¶ 71; Heimdahl Decl. Ex. 14, at 9.) The ARB again identified deficiencies,[32] and again, the Chairperson's incompleteness letter did not set them forth specifically. (*See id.* Ex. 22, at 2.)

This ping-pong match continued through the summer and into the fall, with further revisions being submitted, followed by the ARB taking them up soon thereafter at public meetings and rejecting them as incomplete. (*See* P's 56.1 ¶¶ 73-75, 77-83.) Ultimately, 16 of Plaintiff's 20 applications were deemed complete at an October 26, 2011 meeting of the ARB, confirmed by letter from the Chairperson to the Building Inspector on November 1, 2011. (*See id.* ¶ 84.) The final four were submitted to the ARB in complete form on November 15, 2011 and deemed complete on November 29, 2011, as confirmed by letter from the Chairperson to the Building Inspector on December 3, 2011. (*See id.* ¶¶ 86-87.)

---

[32] Defendants contend that some of the deficiencies that the ARB identified at the June 27, 2011 meeting were previously raised yet uncorrected. (*See* Ds' 56.1 ¶ 71.) As Plaintiff has not provided the Court with copies of the revisions it submitted to the ARB, and Defendants have submitted a Declaration from the Chairperson of the ARB stating what the alleged deficiencies were at the various stages of the completeness review, (*see* Lederer-Plaskett Decl. ¶¶ 19, 24, 27), for purposes of Plaintiff's Motion for Summary Judgment, I find this to present a question of fact that must be resolved in Defendants' favor. For purposes of Defendants' Motion to Dismiss, however, I accept Plaintiff's version of the facts as set forth in the FAC as true. In any event, the content of the deficiencies identified throughout the ARB process presents a question of fact the resolution of which is not necessary to the disposition of the instant Motions.

In both completeness letters, the Chairperson noted that "[s]ince the proposed installation is a special permit use requiring approval by the Zoning Board of Appeals or the Town Board, that Board is charged with determining the adequacy of the responses in the report.  We will, of course, if specifically requested by the Board, offer our opinion to the [B]oard."  (Heimdahl Decl. Ex. 23, at 1-2.)

      3.  <u>Proceedings Before the Town Board</u>

On November 15, 2011, pursuant to the Antenna Law, Plaintiff submitted complete versions of all of its applications for special permits to the Town Board.  (P's 56.1 ¶¶ 91, 96; *see* P's 11/15/11 Letter.)[33]  The Board held its first public hearing on the applications, at which Plaintiff's representatives testified, on November 30, 2011.  (P's 56.1 ¶¶ 100-01; *see* Ds' Ex. T-2 (11/30/11 hearing transcript).)[34]  The Board did not vote on the application at this time, instead adjourning the meeting until December 14, 2011, by which time it expected the engineering firm retained by the Town to have reviewed Plaintiff's applications and issued its report.  (P's 56.1 ¶¶ 102-03.)  This Engineering Report, which issued on December 14, 2011, proceeded on the premise that Plaintiff's sole customer was MetroPCS, and concluded that "[a] gap in service for MetroPCS exists along the proposed node rights-of-way," and that "[t]he proposed NextG nodes will provide service . . . to these gap areas."  (Ds' Eng'g Report 6; *see* P's 56.1 ¶¶ 103-05.)  The Engineering Report also noted that "[b]ased on the configuration of the equipment provided by the applicant, and given the fact that utility poles throughout Greenburgh and Westchester

---

[33] "P's 11/15/11 Letter" refers to the Letter from Peter J. Wise, DelBello Donnellan Weingarten Wise & Wiederkehr, LLP, to Thomas Madden (Nov. 15, 2011).  (Heimdahl Decl. Ex. 25.)  Copies of each of the 20 individual applications were provided to the Court as Exhibit 26 to the Heimdahl Declaration.

[34] "Ds' Ex. T-__" refers to the exhibits upon which the Town relied in rendering its final decision on Plaintiff's application.  (Determination 2-5.)  Defendants submitted copies of these exhibits to the Court with its Motion to Dismiss.  (Doc. 30.)  As to the hearing transcripts – Exhibits T-2, T-4, T-6, T-8, and T-11 – I rely on the pagination in the transcripts submitted as exhibits to the Declaration of Attorney James C. Dalton in Support of Town of Greenburgh, New York, and Town Board of the Town of Greenburgh, New York's Motion to Dismiss First Amended Complaint, (Doc. 65), prepared and submitted at the Court's request.

County currently accommodate cables/wiring, transformers, and utility boxes of similar – or

larger – sizes than NextG's equipment, the proposed NextG nodes do not appear to present a

significant incremental visual impact to the area."  (Ds' Eng'g Report 9; P's 56.1 ¶ 106.)

After the December 14, 2011 hearing regarding Plaintiff's applications, the Town Board

again did not vote, instead adjourning the hearing to January 25, 2012.  (P's 56.1 ¶ 107; *see* Ds'

Ex. T-4 (12/14/11 hearing transcript).)  In the interim, on January 17, 2012, the Town Board held

a work session on Plaintiff's applications.  (P's 56.1 ¶ 108.)  As a result of the work session,

Plaintiff provided the Town with an affidavit from its engineer, Amir Abtahi, (*see* P's 1/26/12

Letter),[35] addressed specifically to Section 285-37(A)(9)(d) of the Town Code, which requires an

applicant for a special permit for siting an antenna in or on property abutting a residential district

to prove "that adequate coverage cannot be achieved by siting or collocating the facility on one

or more . . . permitted [as-of-right] sites . . . or on one or more sites in a nonresidential district, . .

. or that technical or space limitations prevent location or collocation at those sites," Town of

Greenburgh, N.Y., Code § 285-37(A)(9)(d).  Abtahi affirmed that the proposed nodes, which

have coverage radii of approximately 1000 feet, could not be moved to the nearest nonresidential

districts, which averaged approximately 5000 feet away, without creating coverage gaps for

MetroPCS.  (*See* P's 56.1 ¶¶ 114-16; Abtahi Aff. ¶ 5.)[36]

To give the Town's consultant time to review the additional analyses and application

materials requested by the Town (presumably including Abtahi's affidavit), Plaintiff agreed to an

adjournment of the January 25, 2012 public meeting to February 7, 2012.  (P's 56.1 ¶¶ 109, 117.)

---

[35] "P's 1/26/12 Letter" refers to the Letter from Peter J. Wise to Paul Feiner and Members of the Town Board (Jan. 26, 2012).  (Heimdahl Decl. Ex. 29.)

[36] "Abtahi Aff." refers to the NextG Networks of NY, Inc., Affidavit for Town of Greenburgh § 285-37 Communications Facility Application, executed by Amit Abtahi, Radio Frequency Engineer.  (P's 1/26/12 Letter 2-3.)  The engineer's name is misspelled as "Ahtabi" at various places throughout the record.

On that day, the Town Board held a work session with Plaintiff, and afterwards convened its public hearing.  (*Id.* ¶ 117; *see* Ds' Ex. T-8 (2/7/12 hearing transcript).)  Again, the Town Board did not vote on Plaintiff's applications.  (P's 56.1 ¶ 117.)  Instead, it expressed concern about whether Plaintiff had access to New York State rights-of-way, and whether those locations were "as-of-right" and thus preferable under the Town's Antenna Law to Plaintiff's proposed locations, and further suggested sending the application back to the ARB for further review.  (*Id.* ¶ 119; Ds' 56.1 ¶ 119; *see, e.g.*, Ds' Ex. T-8, at 51.)  After the hearing, Plaintiff's counsel sent a letter to the Town, arguing that under Section 285-37(A)(8)(a) of the Town Code, the New York State rights-of-way were not "as-of-right" locations.  (*See* P's 2/17/12 Letter.)[37]

In the meantime, the Town's engineering consultant also requested information from Plaintiff's engineer – specifically, about alternate locations for eight of Plaintiff's proposed nodes.  (P's 56.1 ¶ 118.)  Plaintiff responded that "the alternate equipment locations you have proposed do not meet the coverage objectives for NextG's network design," presumably a reference to MetroPCS's coverage objectives.  (*See* P's 2/21/12 Letter 1; P's 56.1 ¶ 120.)[38] Taking into account this response, as well as other information provided since the issuance of its first report, the Town's consultant issued a Supplemental Engineering Report on February 23, 2012.  (P's 56.1 ¶ 121.)  The Supplemental Engineering Report concluded that 12 of Plaintiff's proposed nodes "appear to be at reasonable locations, with no apparent potential alternate or 'preferred' siting opportunity in the vicinity, based on site reconnaissance, reviews of application materials, and other desk-top analysis."  (Ds' Supp. Eng'g Report 5; P's 56.1 ¶ 123.)  As to the remaining eight, for which the consultant had proposed alternate locations, the consultant, having

---

[37] "P's 2/17/12 Letter" refers to the Letter from Peter J. Wise to Paul Feiner and Members of the Town Board (Feb. 12, 2012).  (Heimdahl Decl. Ex. 30.)

[38] "P's 2/21/12 Letter" refers to the Letter from Peter D. Heimdahl to Michael P. Musso (Feb. 21, 2012).  (Heimdahl Decl. Ex. 31.)

apparently reviewed Plaintiff's responsive technical information and logistical rationales, "found

the responses to the potential alternate locations for the eight nodes to be reasonable."  (Ds'

Supp. Eng'g Report 5-6; P's 56.1 ¶ 124.)

On February 29, 2012, the Town Board held its final public hearing regarding Plaintiff's

applications.  (P's 56.1 ¶ 126; *see* Ds' Ex. T-11 (2/29/12 hearing transcript).)  At its conclusion,

the Town Board closed the public hearing on Plaintiff's applications, and indicated that it would

vote on the applications at a March 20, 2012 meeting.  (P's 56.1 ¶ 126.)  On March 20, 2012,

however, the Board held the vote over to a date to be determined.  (*Id.* ¶ 127.)  Although the

Town Attorney told Plaintiff that he expected a decision at an April 11, 2012 meeting of the

Town Board, (*id.* ¶ 129), the applications were not put on the agenda, and instead the Town

Board discussed referring the applications to the Town's Conservation Advisory Council

("CAC") for review, (*id.* ¶ 130).  On that day, the Board also held a special work session in

conjunction with the CAC, to which Plaintiff was not invited.  (*Id.* ¶ 131.)

Throughout the month of May, Plaintiff corresponded with the Town's newly-retained

special counsel (litigation counsel here) regarding its applications.  (*See id.* ¶¶ 132-35.)  On June

7, 2012, Plaintiff threatened suit "in the event there continue[d] to be no meaningful action on its

application," which Plaintiff considered to be "full resolution of this matter through final vote by

the Town Board to be scheduled under special session by July 10, 2012."  (Heimdahl Decl. Ex.

34; *see* P's 56.1 ¶ 136.)  On June 20, 2012, the Town's special counsel requested additional

information from Plaintiff, following the receipt of which the Board would act on the

applications within 30 days.  (*See* Ds' 6/20/12 Letter; P's 56.1 ¶ 137.)[39]  Specifically, special

counsel asked Plaintiff to:  (1) "[e]xplain the impacts of NextG's recent merger with, or

---

[39] "Ds' 6/20/12 Letter" refers to the Letter from Andrew D.H. Rau, Unruh Turner Burke & Frees, to Peter D.
Heimdahl (June 20, 2012).  (Heimdahl Decl. Ex. 35.)

acquisition by, Crown Castle (completed April 10, 2012) for purposes of access to the New York

State rights-of-way in nonresidential areas"; (2) "[p]rovide a [redacted] copy of your current

agreement with MetroPCS"; (3) "provide . . . a diagram confirming precise dimensions of the

antenna[e] and all supporting equipment" as well as other information relating to proposed

camouflaging and alternate designs; and (4) "[p]rovide information as to the availability of

existing coverage for MetroPCS and all other providers of personal wireless service in the areas

of the proposed DAS installations and why siting in residential areas is necessary to resolve

service gaps."  (Ds' 6/20/12 Letter 2.)

     Plaintiff responded principally by noting that the requested information had previously

been provided to the ARB or the Town Board.  (P's 56.1 ¶ 138.)  Additionally, Plaintiff declined

to provide its agreement with MetroPCS – which in its view constituted "customer proprietary

information and [was] irrelevant to the pending Completed Applications" – and was silent

regarding coverage gaps for other providers of wireless service in the area.  (*See* P's 6/25/12

Letter 2; P's 56.1 ¶ 138.)[40]  Plaintiff again threatened suit absent a final decision on its

applications within 30 days.  (P's 56.1 ¶ 139.)  Special counsel responded that the Town Board

would act on the application within the 30 days, and indeed, on July 24, 2012, the Town Board

issued its Determination denying Plaintiff's applications.  (P's 56.1 ¶¶ 140-41.)

     4.   The Town Board's Determination

     The Town Board, relying on a number of items in the record – including not only the

special permit applications themselves, but also testimony from the public hearings before the

Board, correspondence between Plaintiff and the Town (specifically, the ARB, the Town Board,

and the Town's engineering consultants), and other documents relating to Plaintiff and its

---

[40] "P's 6/25/12 Letter" refers to the Letter from Peter D. Heimdahl to Andrew D.H. Rau (June 25, 2012).  (Heimdahl Decl. Ex. 36.)

proposed installations – denied Plaintiff's applications.  (*See* Determination 2-5.)  The

Determination, which reads like a legal brief, described the applicable law, namely certain

provisions of Section 285-37(A)(9) of the Town Code (requirements for receiving a special

permit), (*see id.* at 8-9), Section 332(c)(7) of the TCA, (*see id.* at 9-12), and Section 253 of the

TCA, (*see id.* at 12-14).  Regarding Section 285-37, the Board noted that it (presumably as

opposed to the ARB) was the body to which the Plaintiff had to prove compliance with the

various provisions.  (*See id.* at 8.)  Regarding Section 332(c)(7), and relying on Second Circuit

precedent, the Board argued that it did not need to grant a special permit unless Plaintiff showed

that there was a service gap in the proposed locations from the perspective of users in a given

area.  (*See id.* at 11 (citing *Sprint Spectrum, L.P. v. Willoth*, 176 F.3d 630, 643 (2d Cir. 1999)).)

The Board also argued that Section 253 was inapplicable because Plaintiff was not providing

"telecommunications service" under the statute and, even if it were, Section 253 does not

override the preservation of local zoning authority provided by Section 332(c)(7).  (*See id.* at 12-

14 (citing *V.I. Tel. Corp. v. FCC*, 198 F.3d 921, 929 (D.C. Cir. 1999)).)

     The Determination went on to discuss Plaintiff's CPCN and its assertion that it is not

subject to the Town's Antenna Law as a public utility seeking to place its installations in public

rights-of-way.  (*See id.* at 14-16.)  Specifically, the Board reasoned that, even if Plaintiff were a

public utility – which according to the Board was not the case because the CPCN did not grant

authorization to provide local exchange service – it nevertheless would be subject to the Town's

Antenna Law, just as any wireless provider would.  (*See id.* at 15.)

     Following this mostly legal discussion, the Board denied Plaintiff's applications, based

on the following findings:  (1) Plaintiff "has not demonstrated that the DAS facilities are

'needed,' as required under Section 285-37.A(9)(a) and consistent with the law of the Second

Circuit," because the proposed facilities are "either purely speculative or for the apparent benefit of a single 'client' of the [Plaintiff]"; (2) Plaintiff "has not demonstrated that the proposed installations are of the 'minimum height and aesthetic intrusion,' as required under Section 285-37.A(9)(b)," because Plaintiff testified that "'we look to get two electronic boxes in there which basically can accommodate two carriers on the same location,'" and thus the proposal was "purely speculative or . . . twice the size needed," but not minimally intrusive; and (3) "[r]equiring a service gap under the law of the Second Circuit [*i.e.*, from the perspective of the users], or requiring minimum intrusiveness, does not violate the [TCA]'s 'federalism' approach." (*Id.* at 17 (quoting Ds' Ex. T-2, at 7-8).)  The Board invited Plaintiff to amend its application to provide material responsive to the Town's June 20, 2012 Letter, address the service gap from the perspective of users in the area, and address "issues of maintenance of, removal upon becoming obsolete and no longer being used, and liability arising from any physical damage which may be caused by the equipment it proposes to install."  (*Id.*)

C. Procedural History

Plaintiff commenced this suit within 30 days of the Town's Determination.  (Doc. 1.)  At a premotion conference held on September 28, 2012, I gave Plaintiff leave to amend its Complaint, which it did on October 12, 2012.  (Doc. 25.)

Plaintiff brings three claims in this action.  Count I alleges a violation of Section 253 of the TCA.  (FAC ¶¶ 98-106.)  Specifically, Plaintiff alleges in Count I that the "Town's actions and inaction" in response to and its ultimate denial of Plaintiff's applications violated Section 253(a), (*id.* ¶¶ 99-101), which provides that "[n]o State or local statute or regulation, or other State or local legal requirement, may prohibit or have the effect of prohibiting the ability of any entity to provide any interstate or intrastate telecommunications service," 47 U.S.C. § 253(a).

Plaintiff also alleges in Count I that the Town cannot rely on the safe harbor of Section 253(c), (*see* FAC ¶¶ 102-05), which reserves State or local authority to manage public rights-of-way "on a competitively neutral and nondiscriminatory basis," 47 U.S.C. § 253(c).

Count II alleges a violation of Section 332(c)(7)(B)(ii) of the TCA, (FAC ¶¶ 107-29), which provides that localities act on a "request for authorization to place, construct, or modify personal wireless service facilities within a reasonable period of time after the request is duly filed with such government or instrumentality, taking into account the nature and scope of such request," 47 U.S.C. § 332(c)(7)(B)(ii).  Specifically, Plaintiff alleges that through the various delays in the application process – dating from its November 13, 2009 initial request for a RUA (alleged to be its original application) to the Board's July 24, 2012 Determination – the Town did not act within the reasonable period of time as set forth by the FCC in its *Shot Clock Order*.  (*See* FAC ¶¶ 107-29.)

Count III alleges a violation of Section 332(c)(7)(B)(iii), (*id.* ¶¶ 130-37), which provides that the Town's decision on Plaintiff's applications "be in writing and supported by substantial evidence contained in a written record," 47 U.S.C. § 332(c)(7)(B)(iii).  Plaintiff alleges that the Determination is not based on substantial evidence because it established MetroPCS's service coverage gap in the area of its proposed DAS, and because there is no non-residential right-of-way location that would close that gap.  (*See* FAC ¶¶ 130-37.)

Plaintiff seeks a declaratory judgment that the Town has violated the respective provisions of the TCA, and further seeks a mandatory injunction requiring the Town to grant "such permits or other authority as is necessary to allow [Plaintiff] to install, operate, and maintain its facilities in the Town's public rights of way as set forth in [Plaintiff]'s application." (FAC 29.)

Defendants have moved to dismiss the FAC, (Doc. 27), and Plaintiff has cross-moved for summary judgment, (Doc. 32). For the reasons set forth below, Defendants' Motion is hereby GRANTED IN PART and DENIED IN PART, and Plaintiff's Motion is hereby GRANTED IN PART and DENIED IN PART.

## II.  LEGAL STANDARDS

### A.  Motion to Dismiss

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* "While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555 (alteration, citations, and internal quotation marks omitted). While Federal Rule of Civil Procedure 8 "marks a notable and generous departure from the hyper-technical, code-pleading regime of a prior era, . . . it does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions." *Iqbal*, 556 U.S. at 678-79.

In considering whether a complaint states a claim upon which relief can be granted, the court "begin[s] by identifying pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth," and then determines whether the remaining well-pleaded factual allegations, accepted as true, "plausibly give rise to an entitlement to relief." *Id.* at 679. Deciding whether a complaint states a plausible claim for relief is "a context-specific task that

requires the reviewing court to draw on its judicial experience and common sense." *Id.*

"[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of

misconduct, the complaint has alleged – but it has not 'shown' – 'that the pleader is entitled to

relief.'" *Id.* (alteration omitted) (quoting Fed. R. Civ. P. 8(a)(2)).

When deciding a motion to dismiss, ordinarily the court's "review is limited to the facts

as asserted within the four corners of the complaint, the documents attached to the complaint as

exhibits, and any documents incorporated in the complaint by reference," *McCarthy v. Dun &*

*Bradstreet Corp.*, 482 F.3d 184, 191 (2d Cir. 2007), which here includes the Town Board's

Determination as well as the exhibits upon which it relied.  But the court can also consider

documents on the terms and effect of which the complaint heavily relies – that is, documents

"integral" to the complaint.  *See Chambers v. Time Warner, Inc.*, 282 F.3d 147, 153 (2d Cir.

2002).  Here, this includes all of the correspondence between Plaintiff and the Town, for what

was said in the correspondence, not for the truth of what was said.

B.  <u>Motion for Summary Judgment</u>

Summary judgment is appropriate when "the movant shows that there is no genuine

dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed.

R. Civ. P. 56(a).  "[T]he dispute about a material fact is 'genuine' . . . if the evidence is such that

a reasonable jury could return a verdict for the nonmoving party."  *Anderson v. Liberty Lobby,*

*Inc.*, 477 U.S. 242, 248 (1986).  A fact is "material" if it "might affect the outcome of the suit

under the governing law . . . . Factual disputes that are irrelevant or unnecessary will not be

counted."  *Id.*  On a motion for summary judgment, "[t]he evidence of the non-movant is to be

believed, and all justifiable inferences are to be drawn in his favor."  *Id.* at 255.  The movant

bears the initial burden of demonstrating "the absence of a genuine issue of material fact," and, if

satisfied, the burden then shifts to the non-movant to present "evidence sufficient to satisfy every element of the claim." *Holcomb v. Iona Coll.*, 521 F.3d 130, 137 (2d Cir. 2008) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986)).  "The mere existence of a scintilla of evidence in support of the [non-movant's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-movant]." *Anderson*, 477 U.S. at 252.  Moreover, the non-movant "must do more than simply show that there is some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986), and he "may not rely on conclusory allegations or unsubstantiated speculation," *Fujitsu Ltd. v. Fed. Express Corp.*, 247 F.3d 423, 428 (2d Cir. 2001) (internal quotation marks omitted).

"A party asserting that a fact cannot be or is genuinely disputed must support the assertion by . . . citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials . . . ."  Fed. R. Civ. P. 56(c)(1).  Where an affidavit is used to support or oppose the motion, it "must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant . . . is competent to testify on the matters stated."  Fed. R. Civ. P. 56(c)(4); *see Major League Baseball Props*, 542 F.3d at 310.  In the event that "a party fails . . . to properly address another party's assertion of fact as required by Rule 56(c), the court may," among other things, "consider the fact undisputed for purposes of the motion" or "grant summary judgment if the motion and supporting materials – including the facts considered undisputed – show that the movant is entitled to it."  Fed. R. Civ. P. 56(e)(2), (3).

C.  Section 253 of the TCA

Congress enacted the TCA "to provide for a pro-competitive, de-regulatory national

policy framework designed to accelerate rapidly private sector deployment of advanced

telecommunications and information technologies and services by opening all

telecommunications markets to competition."  *Cellular Tel. Co. v. Town of Oyster Bay*, 166 F.3d

490, 493 (2d Cir. 1999) (alterations and internal quotation marks omitted).  Section 253(a) –

which applies to all providers of "telecommunications services," not just wireless providers –

renders unlawful State or local statutes, regulations, or other legal requirements that "prohibit or

have the effect of prohibiting the ability of any entity to provide any interstate or intrastate

telecommunications service."  47 U.S.C. § 253(a).  Section 253 is, at its core, a preemption

statute, *see Wyeth v. Levine*, 555 U.S. 555, 576 n.9 (2009) (describing Section 253(a), together

with Section 253(d), as a statute authorizing the FCC to preempt state or local statutes,

regulations, or legal requirements); *N.Y. SMSA Ltd. P'ship v. Town of Clarkstown*, 603 F. Supp.

2d 715, 727 (S.D.N.Y. 2009) (same), "the purpose of [which] is to impose some limits on the

ability of state and local governments to regulate telecommunications," *NextG Networks of NY,

Inc. v. City of N.Y.*, 513 F.3d 49, 53 (2d Cir. 2008).  "[A] prohibition does not need to be

complete or insurmountable to run afoul of [Section] 253(a)"; it need only "materially inhibit[]

or limit[] the ability of any competitor or potential competitor to compete in a fair and balanced

legal and regulatory environment."  *TCG N.Y., Inc. v. City of White Plains*, 305 F.3d 67, 76 (2d

Cir. 2002) (internal quotation marks omitted).

D.  Section 332(c)(7) of the TCA

Section 332(c)(7), which relates only to the zoning of "personal wireless service

facilities," 47 U.S.C. § 332(c)(7)(A), embodies the balance Congress struck "between 'two

24

competing aims – to facilitate nationally the growth of wireless telephone service and to maintain substantial local control over siting of towers.'"  *Omnipoint Commcn's, Inc. v. City of White Plains*, 430 F.3d 529, 531 (2d Cir. 2005) (quoting *Town of Amherst, N.H. v. Omnipoint Commc'ns Enters., Inc.*, 173 F.3d 9, 13 (1st Cir. 1999)).  Thus, Congress committed the siting of wireless facilities to the discretion of state and local governments, subject only to the limitations set forth in Section 332(c)(7)(B).  *See* 47 U.S.C. § 332(c)(7)(A) ("[D]ecisions regarding the placement, construction, and modification of personal wireless service facilities" – in other words, wireless antennae – are left to the discretion of local or state governments or instrumentalities "[e]xcept as provided in [Section 332(c)(7)(B)]."); *Willoth*, 176 F.3d at 637 ("[T]he TCA preserves local zoning authority in all other respects over the siting of wireless facilities . . . .").

Accordingly, siting decisions may not "unreasonably discriminate among providers of functionally equivalent services," 47 U.S.C. § 332(c)(7)(B)(i)(I), and may not "prohibit or have the effect of prohibiting the provision of personal wireless services," *id.* § 332(c)(7)(B)(i)(II).  Furthermore, "any request for authorization to place, construct, or modify personal wireless service facilities" must be acted upon "within a reasonable period of time after the request is duly filed," *id.* § 332(c)(7)(B)(ii), and a denial decision must be "in writing and supported by substantial evidence contained in a written record," *id.* § 332(c)(7)(B)(iii).  Such siting decisions may not be made "on the basis of the environmental effects of radio frequency emissions to the extent that such facilities comply with the [FCC]'s regulations concerning such emissions."  *Id.* § 332(c)(7)(B)(iv).  Any person aggrieved by a siting decision may seek recourse in federal court.  *See id.* § 332(c)(7)(B)(v).

25

1.   <u>Section 332(c)(7)(B)(ii)</u>

In recognition of the ambiguity as to what constitutes a "reasonable period of time" under Section 332(c)(7)(B)(ii), and "[t]o provide guidance, remove uncertainty and encourage the expeditious deployment of wireless broadband services," the FCC – upon the petition of wireless providers – issued its *Shot Clock Order* in 2009.  *See Shot Clock Order*, 24 F.C.C. Rcd. at 14005. As discussed above, *see supra* note 9, the FCC defined "reasonable period of time" to presumptively mean "90 days to process personal wireless service facility siting applications requesting collocations, and . . . 150 days to process all other applications," *Shot Clock Order*, 24 F.C.C. Rcd. at 14005.[41]  This presumption is rebuttable, as well as extendable on mutual consent of the parties.  *Id.* at 14005, 14013.  The FCC recognized that applications may be incomplete, and therefore deemed the time it takes for the applicant to respond to requests for additional information excludable from the 90- or 150-day time period, but "only if that State or local government notifies the applicant within the first 30 days that its application is incomplete."  *Id.* at 14015.  The Fifth Circuit recently addressed a challenge to the FCC's authority to promulgate the rules set forth in the *Shot Clock Order*, and held that the FCC's interpretation of the "reasonable period of time" language was entitled to *Chevron* deference as a permissible construction of an ambiguous statute.  *See City of Arlington, Tex. v. FCC*, 668 F.3d 229, 256 (5th Cir. 2012), *aff'd*, 133 S. Ct. 1863 (2013).[42]  I agree with the Fifth Circuit's well-reasoned

---

[41] The FCC defined "collocation" for purposes of this standard as a proposal that "does not involve a substantial increase in the size of a tower," which in turn means, among other things, "increas[ing] the existing height of the tower by more than 10%," or the "installation of more than the standard number of new equipment cabinets for the technology involved, not to exceed four."  *Shot Clock Order*, 24 F.C.C. Rcd. at 14012 & n.146 (internal quotation marks omitted).

[42] The U.S. Supreme Court granted certiorari to review the Fifth Circuit's decision on the limited question of "whether an agency's interpretation of a statutory ambiguity that concerns the scope of its regulatory authority (that is, its jurisdiction) is entitled to [*Chevron*] deference."  *City of Arlington, Tex. v. FCC*, 133 S. Ct. 1863, 1866 (2013). The Court held that there was no difference between a "jurisdictional" and "nonjurisdictional" inquiry in the agency review context; "[n]o matter how it is framed, the question a court faces when confronted with an agency's interpretation of a statute it administers is always, simply, *whether the agency has stayed within the bounds of its*

analysis, *see id.* at 256-60, and accord *Chevron* deference to the FCC's definition of Section

332(c)(7)(B)(ii)'s "reasonable period of time" language as set forth in the *Shot Clock Order*.

    2.  <u>Section 332(c)(7)(B)(iii)</u>

      Section 332(c)(7)(B)(iii) contains two distinct requirements:  (1) that a locality's denial of

a siting application be in writing; and (2) that it be supported by "substantial evidence contained

in a written record."  47 U.S.C. § 332(c)(7)(B)(iii).  As to the latter, "substantial evidence" refers

to the "traditional standard used for judicial review of agency actions."  *Willoth*, 176 F.3d at 638

(internal quotation marks omitted).  In other words, "substantial evidence" means, when viewing

the record in its entirety, "such relevant evidence as a reasonable mind might accept as adequate

to support a conclusion."  *Omnipoint Commc'ns*, 430 F.3d at 533 (internal quotation marks

omitted).  Although this is a "deferential standard," *id.*, "denials subject to the TCA are reviewed

. . . more closely than standard local zoning decisions," *Cellular Tel. Co.*, 166 F.3d at 493.

Judicial review in this context thus "requires evaluation of the entire record, including opposing

evidence"; if the denial is supported by "less than a preponderance, but more than a scintilla of

evidence," it will stand.  *Willoth*, 176 F.3d at 638 (internal quotation marks omitted).

      The substantive law under which to evaluate whether substantial evidence supports a

denial is the applicable state or local law.  *See Cellular Tel. Co.*, 166 F.3d at 494 ("When

evaluating the evidence, local and state zoning laws govern the weight to be given the

evidence."); *id.* at 495-96 (determining under state common law whether substantial evidence

supported locality's decision); *N.Y. SMSA Ltd. P'ship v. Vill. of Floral Park Bd. of Trs.*, 812 F.

Supp. 2d 143, 153-66 (E.D.N.Y. 2011) (same under local law); *MetroPCS N.Y., LLC v. City of

Mount Vernon*, 739 F. Supp. 2d 409, 421 (S.D.N.Y. 2010) (same); *Sprint Spectrum L.P. v. Bd. of*

---

*statutory authority.*"  *Id.* at 1868 (emphasis in original).  The Court therefore agreed that *Chevron* deference was
appropriate as to the FCC's decision that it had authority to define "reasonable period of time."  *See id.* at 1874-75.

*Zoning Appeals of Brookhaven*, 244 F. Supp. 2d 108, 114-17 (E.D.N.Y. 2003) (same under state

common law and local law).  In this case, the applicable local law is the Town's Antenna Law,

Section 285-37 of the Town Code.

E.  The Greenburgh Town Antenna Law

Greenburgh's Antenna Law reflects a preference for siting new antennae in

nonresidential areas, though it does not foreclose siting elsewhere.  *See* Town of Greenburgh,

N.Y., Code § 285-37(A).  The Law establishes "as-of-right" sites – including, among other

places, lots in nonresidential districts "having a lot line abutting a state or local thoroughfare with

four or more lanes," *id.* § 285-37(A)(8)(a) – for which a streamlined application process is

available, subject only to review by the ARB for aesthetic and visual considerations, *id.* § 285-

37(A)(8).  For all other sites, a "special permit" is required from the Town Board (if on Town-

owned property) or the Zoning Board of Appeals (if not).  *See id.* § 285-37(A)(9).  The Law sets

forth numerous items required to be included in an application for a special permit, *see id.* § 285-

37(A)(16), and charges the ARB with determining whether an application meets these

requirements, *see id.* § 285-37(A)(1)(c)-(e).  Substantively, an applicant for a special permit must

prove to the reviewing body, among other things:

> (a) That the facility is needed to provide coverage to an area of the
> unincorporated area of the Town that currently has inadequate
> coverage[;]
>
> (b) That the facility is the minimum height and aesthetic intrusion
> necessary to provide that coverage[;] . . . [and]
>
> (d) If proposed for placement in a residential district or on Town-
> owned property which abuts a residential district, that adequate
> coverage cannot be achieved by siting or collocating the facility on
> one or more [as-of-right sites] or on one or more sites in a
> nonresidential district, that all reasonable measures in siting the

facility at all those locations have been exhausted or that technical
or space limitations prevent location or collocation at those sites.

*Id.* § 285-37(A)(9).

## III. <u>DISCUSSION</u>

### A. <u>Count I – Plaintiff's Section 253 Claim</u>

Plaintiff alleges that the Town's actions and inaction throughout the application process,
and its ultimate denial of Plaintiff's applications, violate Section 253 because they have the
effect of prohibiting provision of Plaintiff's services in the Town.  In support of its Motion for
Summary Judgment, Plaintiff argues that the delay in processing its application alone violates
Section 253(a).  (P's SJ Mem. 9-10.)[43]

#### 1. <u>Whether Plaintiff Provides "Telecommunications Service"</u>

A threshold question under Section 253 is whether Plaintiff is offering to provide
"telecommunications service" as defined by the TCA.  Under the TCA, "telecommunications
service" means "the offering of telecommunications for a fee directly to the public, or to such
classes of users as to be effectively available directly to the public, regardless of the facilities
used."  47 U.S.C. § 153(53) (formerly codified at 47 U.S.C. § 153(46)).  "Telecommunications"
in turn is defined as "the transmission, between or among points specified by the user, of
information of the user's choosing, without change in the form or content of the information as
sent or received."  *Id.* § 153(50).

A provider of "telecommunications service" has been interpreted to be coextensive with
"common carrier" – that is, a provider that holds itself out indiscriminately.  *See V.I. Tel. Corp.*,
198 F.3d at 926-27 (applying *Chevron* deference and adopting the FCC's reasonable
interpretation of the statutory definition of "telecommunications service"); *accord Iowa*

---

[43] "P's SJ Mem." refers to Plaintiff's Memorandum of Law in Support of Motion for Summary Judgment.  (Doc.
33.)

*Telecomm. Servs., Inc. v. Iowa Utilities Bd.*, 563 F.3d 743, 749 (8th Cir. 2009); *Verizon Cal., Inc. v. FCC*, 555 F.3d 270, 275 (D.C. Cir. 2009); *Berkshire Tel. Corp. v. Sprint Commc'ns Co.*, No. 05-CV-6502, 2006 WL 3095665, at *4 (W.D.N.Y. Oct. 30, 2006).  A provider may be a common carrier even if its services are not practically available to the entire public; "a specialized carrier whose service is of possible use only to a fraction of the population may nonetheless be a common carrier if he holds himself out to serve indifferently all potential users."  *Nat'l Ass'n of Regulatory Utility Comm'rs v. FCC* (*NARUC II*), 533 F.2d 601, 608 (D.C. Cir. 1976); *see Compass Global, Inc.*, 23 F.C.C. Rcd. 6125, 6132-33 (2008) ("To qualify as a telecommunications carrier, companies only need to offer indiscriminate service to whatever public their services may legally and practically be of use.") (citing *Nat'l Ass'n of Regulatory Utility Comm'rs v. FCC* (*NARUC I*), 525 F.2d 630, 642 (D.C. Cir. 1976)).  If, however, a provider intends to "make individualized decisions in particular cases whether and on what terms to serve," it is not a common carrier.  *NARUC II*, 533 F.2d at 608-09; *accord Cellco P'ship v. FCC*, 700 F.3d 534, 546-47 (D.C. Cir. 2012).

Defendants' principal argument is that Plaintiff's services are intended for only one customer, MetroPCS, and therefore Plaintiff does not intend to hold itself out indiscriminately to all potential customers.  Plaintiff alleges that it intends to serve both its "current customer and potential customers."  (FAC ¶ 9.)[44]  The Town's own engineering consultant recognized that Plaintiff's DAS could accommodate potential customers beyond MetroPCS, (*see* Ds' Eng'g Report 4; Ds' Supp. Eng'g Report 1-2), and Plaintiff has obtained a CPCN from New York State, (FAC ¶ 1), which signals to the public Plaintiff's intent to operate as a common carrier, *see*

---

[44] Plaintiff represents that it intends to offer its services indiscriminately to all potential customers, (*see* Plaintiff's Memorandum of Law in Opposition to Defendants' Motion to Dismiss ("P's MTD Mem."), (Doc. 38), 11 ("Crown Castle holds itself out to be a common carrier that will serve all potential users of its telecommunications service.")), but no corresponding allegation appears in the FAC.

*Verizon Cal.*, 555 F.3d at 275.  That Plaintiff has an individual contract with its current customer is not necessarily inconsistent with it being a common carrier.  *See Iowa Telecomm. Servs.*, 563 F.3d at 748-50.  "Whether an entity is a telecommunications carrier turns on the entity's *offer* to provide services, not the current customer base."  *Time Warner Cable Info. Servs. (N.C.), LLC v. Duncan*, 656 F. Supp. 2d 565, 573 (E.D.N.C. 2009) (emphasis added).  In light of my disposition below, however, I need not definitively decide whether Plaintiff has plausibly pleaded that it is offering to provide "telecommunications service" under the TCA, *see Iowa Telecomm. Servs.*, 563 F.3d at 749-50; *Verizon Cal.*, 555 F.3d at 275-76, and I will assume for the sake of argument that it has.

      2.  <u>Whether the Town Violated Section 253</u>

      Plaintiff argues that the Town violated Section 253(a) through its delays in processing and ultimate denial of its applications.  The Town's decision under its Antenna Law, however, is clearly a zoning decision regarding the placement or construction of Plaintiff's proposed DAS, not a franchising requirement or other potentially discriminatory licensing scheme, the typical subject of a Section 253 claim.  *See Vertical Broad., Inc. v. Town of Southampton*, 84 F. Supp. 2d 379, 388-89 (E.D.N.Y. 2000).  Such a zoning decision is squarely within the ambit of Section 332(c)(7)(A) of the TCA:

> *Except as provided in this paragraph, nothing in this chapter* shall limit or affect the authority of a State or local government or instrumentality thereof over decisions regarding the placement, construction, and modification of personal wireless service facilities.

47 U.S.C. § 332(c)(7)(A) (emphasis added).  The plain language of the statute indicates that Section 253 – which, along with Section 332, is within Chapter 5 of Title 47 of the United States Code – cannot limit the Town's authority regarding the zoning decision (or the time it takes in processing zoning applications).  Any limitations on the Town's antenna zoning authority, and

the statutory basis for Plaintiff's remedy, must lie within Section 332(c)(7) itself.[45]  *See City of*

*Arlington*, 133 S. Ct. at 1866 (Section 332(c)(7)(A) "provides that nothing in the [TCA], *except*

those limitations provided in [Section] 332(c)(7)(B), 'shall limit or affect the authority of a State

or local government' over siting decisions") (emphasis in original) (quoting 47 U.S.C. §

332(c)(7)(A)); *Vertical Broad.*, 84 F. Supp. 2d at 388 (refusing to allow claim based on local

decision regarding the siting of a communications tower to go forward under Section 253 where

plaintiff's Section 332(c)(7) claim fell outside the 30-day statute of limitations, because Section

332(c)(7) "speaks specifically to local decisions regarding the siting of communications towers

and of the judicial recourse available to those who feel that a local body has acted outside the

strictures of the TCA"); *see also USCOC of Greater Mo., L.L.C. v. Vill. of Marlborough, Mo.*,

618 F. Supp. 2d 1055, 1065 (E.D. Mo. 2009) ("Section 253 may be used to challenge zoning

regulations on their face, but is not the proper section to challenge an *application* of a zoning

regulation.") (emphasis added); *cf. Sprint Spectrum L.P. v. Mills*, 283 F.3d 404, 420 (2d Cir.

2002) ("[U]nless a limitation is provided in [Section] 332(c)(7), we must infer that Congress's

intent to preempt did not extend so far.").

Plaintiff's position that Section 253 and Section 332(c)(7) are both applicable to the

Town's Determination – indisputably one "regarding placement, construction, and modification

---

[45] In responding to the Town's arguments along these lines, (*see* P's MTD Mem. 13), Plaintiff lamented that such an interpretation would leave it without the protection of either Section 253 or Section 332(c)(7)(B)(i)(II) – which contains language similar to Section 253(a) and provides that a Town's decision on the placement, construction, or modification of personal wireless facilities "shall not prohibit or have the effect of prohibiting the provision of personal wireless services," 47 U.S.C. § 332(c)(7)(B)(i)(II).  In so arguing, Plaintiff conceded that it could not bring a claim under Section 332(c)(7)(B)(i)(II), because it "does not provide Commercial Mobile Radio Services," apparently a reference to the definition of "personal wireless services" under Section 332(c)(7)(C)(i).  (P's MTD Mem. 13-14.)  The Court is baffled by this argument, as Plaintiff has affirmatively brought claims under Section 332(c)(7)(B)(ii) and (iii), subsections to which its concession would seem to apply equally.  Nevertheless, Defendants do not contest that the Town's Antenna Law and its decision on Plaintiff's applications are subject to Section 332(c)(7).  And, other than Plaintiff's seeming concession, I cannot see why Section 332(c)(7) would not apply; Plaintiff's arguments that as a "carrier's carrier" it provides "personal wireless service facilities," 47 U.S.C. § 332(c)(7), seem valid.

of personal wireless service facilities," 47 U.S.C. § 332(c)(7)(A) – would render the "[e]xcept as provided in this paragraph, nothing in this chapter shall limit" language of Section 332(c)(7)(A) "insignificant, if not wholly superfluous," *Duncan v. Walker*, 533 U.S. 167, 174 (2001); *see id.* (giving effect to all words of a statute is a cardinal principal of statutory construction); *cf.* H.R. Rep. No. 104-458, at 207-08 (1996) (Conf. Rep.), *reprinted in* 1996 U.S.C.C.A.N 10, 222 ("The conference agreement creates a new section [*i.e.*, 47 U.S.C. § 332(c)(7)] which prevents Commission preemption of local and State land use decisions and preserves the authority of State and local governments over zoning and land use matters except in the limited circumstances set forth in the conference agreement [*i.e.*, 47 U.S.C. § 332(c)(7)(B)].")

The cases Plaintiff cites are of no help, and in fact support the Town's position.  For example, in *Cox Communications PCS, L.P. v. City of San Marcos*, 204 F. Supp. 2d 1272 (S.D. Cal. 2002), the district court specifically distinguished between Section 253, "which provides a cause of action against *local regulations*," and Section 332(c)(7), which "gives a cause of action against *local decisions*."  *Id.* at 1277 (emphases in original).  In that case, the court allowed a Section 253 claim to go forward at the pleading stage because plaintiff there facially challenged an ordinance requiring it to obtain a conditional use permit before using the public rights-of-way for wireless facilities, *see id.* at 1279-80, but dismissed a corresponding Section 332(c)(7) claim because plaintiff had not gone through the statutorily-ordained process and been aggrieved by it, *see id.* at 1275, 1277.  Not only is *Cox Communications* factually inapposite (because Plaintiff here complains not of the burden of the Antenna Law itself but of its treatment thereunder), but it supports the understanding that Section 253 is a preemption statute that at its heart deals with laws themselves, not discretionary decisions made pursuant to those laws.[46]

---

[46] Plaintiff does not argue that the Antenna Law is preempted by Section 253.  Indeed, it appears that the Antenna Law alone creates no independent barrier to entry that would violate Section 253.  While it certainly grants

Plaintiff also cites *Mills*, 283 F.3d 404, as reviewing a siting decision under Sections 253 and 332(c)(7).  (P's MTD Mem. 12-13.)  Although the district court at an earlier stage of that case found a single local decision to violate both sections, *see Sprint Spectrum L.P. v. Mills*, 65 F. Supp. 2d 148, 158-159 (S.D.N.Y. 1999), the Second Circuit relied exclusively upon Section 332(c)(7) in holding that a school district's position with respect to its lease with a wireless provider was proprietary, not regulatory, in nature, and thus did not offend the TCA, *see Mills*, 283 F.3d at 420-21.  Plaintiff also points to *NextG Networks of N.Y., Inc. v. City of N.Y.*, No. 03-CV-9672, 2004 WL 2884308, at *4 n.8 (S.D.N.Y. Dec. 10, 2004), as "citing *Mills* in support of rejecting the argument that Section 332 prevents NextG from bringing a Section 253 claim." (P's MTD Mem. 13.)  In that case, however, the district court cited *Mills* as simply "analyzing Sections 253 and 332 separately," and indeed, cited only to the portion of *Mills* which described what the district court did below, not the Second Circuit's analysis.  *See id.* at *4 n.8 (citing *Mills*, 283 F.3d at 409-10).[47]

---

discretion to the Town as to the siting of antennae, it does so based on traditional zoning factors, such as aesthetics and property values, *see Cellular Tel. Co.*, 166 F.3d at 494 ("TCA does not affect or encroach upon the substantive standards to be applied under established principles of state and local law," including the principle that "aesthetic concerns can be a valid basis for zoning decisions") (internal quotation marks omitted), and retains flexibility to account for necessity and technical feasibility, *see Town of Greenburgh, N.Y, Code § 285-37(A)(9)*.  The Antenna Law is thus not at all similar to the provisions of the ordinance that the Second Circuit invalidated in *TCG N.Y.*, which granted the City of White Plains unfettered discretion to reject a franchise application based on "any public interest factors that are deemed pertinent by the City"; such provisions were held to be tantamount to a "right to prohibit providing telecommunications services, albeit one that can be waived by the City."  *TCG N.Y.*, 305 F.3d at 76 (alteration and internal quotation marks omitted).  Therefore, even if Plaintiff had brought a claim for facial invalidity of the Town's Antenna Law under Section 253(a), such claim would be dismissed.

[47] I am doubtful that, even if Section 253 does apply here, Plaintiff has a claim based on the denial of its applications or the delay in processing them.  The denial of Plaintiff's siting applications "does not constitute a general barrier to entry as proscribed by 47 U.S.C. § 253," *Global NAPs, Inc. v. Verizon New England, Inc.*, 454 F.3d 91, 102 (2d Cir. 2006), because (except perhaps as an economic matter) it does not prevent Plaintiff from entering the market, in that it does not foreclose Plaintiff seeking alternative means of achieving its desired end (for example, re-submitting its applications with additional information or considering alternate sites), *see id.*; *see also Coastal Commc'ns Serv., Inc. v. City of N.Y.*, 658 F. Supp. 2d 425, 441 (E.D.N.Y. 2009) ("Section 253(a) concerns itself solely with the provision of service, not whether the putative service can survive economically.").  As to delay alone, Plaintiff cites *TCG N.Y.*, 305 F.3d at 76-77, as holding that "a delay of less than two years by a municipality in processing a franchise application violated Section 253(a) because the telecommunications company was prohibited from providing its services during that time." (P's SJ Mem. 10.)  While it is true that the Second Circuit stated that "the extensive delays in processing TCG's request for a franchise have prohibited TCG from providing service for the

### 3.  Plaintiff's Section 253(a) Claim is Dismissed

For the foregoing reasons, Defendants' Motion to Dismiss as to Plaintiff's Section 253(a)

claim is granted.

### B.  Count II – Plaintiff's Section 332(c)(7)(B)(ii) Claim

Plaintiff's claim under Section 332(c)(7)(B)(ii) is based on the Town's failure to process

its applications within a "reasonable period of time" as defined by the FCC in its *Shot Clock*

*Order*.  Even if I were to find a violation of Section 332(c)(7)(B)(ii), however, a "local

authority's exceeding a reasonable time for action would not, in and of itself, entitle the siting

applicant to an injunction granting the application."  *Shot Clock Order*, 24 F.C.C. Rcd. at 14005

n.99.  Indeed, "the only reasonable [equitable] relief for such a failure [would be] to require a

written decision, which [the Town] ha[s] already provided."  *Clear Wireless, LLC v. City of*

*Wilmington*, No. 10-CV-218, 2010 WL 3463729, at *4 (D. Del. Aug. 30, 2010); *see Omnipoint*

*Commc'ns, Inc. v. Vill. of Tarrytown Planning Bd.*, 302 F. Supp. 2d 205, 214 n.7 (S.D.N.Y.

2004) (claim for injunctive relief for violation of Section 332(c)(7)(B)(ii) mooted by subsequent

denial of application); *N.Y. SMSA Ltd. P'ship v. Town of Clarkstown*, 99 F. Supp. 2d 381, 394

(S.D.N.Y. 2000) (after Town Board reached decision denying applications, claim of delay was

moot because "[p]laintiffs [could] no longer make the claim that the delay had the effect of

denial of wireless services").  Because Plaintiff has already received the relief to which it would

---

duration of the delays," *TCG N.Y.*, 305 F.3d at 76, the delay was not a separate basis for finding a violation of
Section 253(a), but was merely an example of the plaintiff in that case being subject to burdens to which others were
not, *see id.* at 76-77 (right to reject and delays in processing franchise applications under the Ordinance violate
Section 253(a) because they present "obstacles . . . to TCG's ability to compete in White Plains *on a fair basis*")
(emphasis added); *see also Montgomery Cnty. Md. v. Metromedia Fiber Network, Inc.*, 326 B.R. 483, 493 (S.D.N.Y.
2005) ("[S]ubjecting new market entrants, such as [plaintiff], to a lengthy and discretionary process, while
exempting the incumbent provider, Verizon, from such process, has the effect of prohibiting the provision of
telecommunications services, because it 'materially inhibits or limits the ability' of the new entrant 'to compete in a
*fair and balanced* legal and regulatory environment.'") (emphasis in original) (quoting *TCG N.Y.*, 305 F.3d at 76),
*aff'g sub nom. In re Metromedia Fiber Network, Inc.*, 313 B.R. 153 (Bankr. S.D.N.Y. 2004), *vacated and remanded*
*pursuant to joint motion*, No. 05-4123 (2d Cir. Aug. 31, 2006).

be entitled, Plaintiff's claim for injunctive relief for violation of Section 332(c)(7)(B)(ii) is dismissed as moot.[48]

C. Count III – Plaintiff's Section 332(c)(7)(B)(iii) Claim

The Town Board stated two reasons for its denial of Plaintiff's applications.  First, the Board found that Plaintiff had not demonstrated that its proposed antennae were "needed" under Section 285-37(A)(9)(a) of the Town's Antenna Law "and consistent with the law of the Second Circuit," because the gap in service that the proposed DAS was designed to fill was only MetroPCS's, not a gap from the perspective of users in the area.  (*See* Determination 17; *see also id.* at 11 (relying on *Willoth* to conclude that in the Second Circuit, a service gap is measured from the perspective of the users).)  Second, the Board found that Plaintiff had not demonstrated that its proposed antennae were of the "minimum height and aesthetic intrusion" necessary to provide service, pursuant to Section 285-37(A)(9)(b), citing testimony of Plaintiff's representative that the proposed equipment cabinet was designed to accommodate not just MetroPCS, its initial client, but another potential carrier without further modification.  (*See id.* at 17 ("Whether the equipment proposed is purely speculative or whether it is twice the size needed, in either case, upon the record made by the [Plaintiff], it does not meet the standard of minimal intrusiveness.").)[49]  Because neither of these conclusions are supported by "substantial evidence contained in a written record," I find that the Town has violated Section 332(c)(7)(B)(iii).

---

[48] Nevertheless, the extent of delay influences my determination as to whether remand is an appropriate remedy here for a violation of Section 332(c)(7)(B)(iii).  *See infra* Part III.D.

[49] The Board also noted that "[r]equiring a service gap under the law of the Second Circuit, or requiring minimum intrusiveness, does not violate the [TCA]'s 'federalism' approach."  (Determination 17.)  This is not a reason for a denial, so much as an apparently accurate statement that the two stated requirements do not in and of themselves violate the TCA.

1.  Whether the DAS is "Needed"

There is no dispute that Plaintiff proved that there was a service gap for its initial client, MetroPCS, and that Plaintiff's proposed DAS was needed to fill that service gap.  (*See* P's 56.1 ¶¶ 103-05, 111, 122; *see also* Ds' Eng'g Report 6; Ds' Supp. Eng'g Report 5-6.)  The Town Board relied on Second Circuit precedent – specifically, *Willoth* – to support its conclusion under its Antenna Law that Plaintiff's services are not "needed," in that users in the area do not experience a coverage gap because other carriers provide service.  The Town's position in the Determination is a wholly legal one – that the Second Circuit measures whether a wireless service is "needed" from the perspective of users in a given area, not from the perspective of a provider.

I find that in this respect, the Board's Determination is premised on an error of law, which necessarily means it is not supported by substantial evidence.  *Cf. Willoth*, 176 F.3d at 645 ("We will annul an agency's determination . . . '[w]here . . . its determination is affected by an error of law . . . .'") (second alteration in original) (quoting *WEOK Broad. Corp. v. Planning Bd. of Lloyd*, 79 N.Y.2d 373, 383 (1992)); *Omnipoint Commc'ns, Inc. v. Common Council of Peekskill*, 202 F. Supp. 2d 210, 223 (S.D.N.Y. 2002) (citing and quoting *Townley v. Heckler*, 748 F.2d 109, 112 (2d Cir. 1984), as "observing that where an ALJ's determination is reviewed under a substantial evidence standard, the '[f]ailure to apply the correct legal standards is grounds for reversal'").  Furthermore, as the Board relied on federal law, not state or local law, in reaching its determination, it is appropriate for the federal judiciary to correct the Board's error in interpreting federal law.  *Cf. Indiana ex rel. Anderson v. Brand*, 303 U.S. 95, 98-99 (1938) (U.S. Supreme Court has jurisdiction to review judgment of state court of last resort if it decided a federal question, even where the "state court might have based its decision, consistently with the record, upon an independent and adequate non-federal ground").

It was for a time unsettled in the Second Circuit whether a coverage gap should be measured from the perspective of an individual user or a particular service provider.  *See Omnipoint Commcn's*, 430 F.3d at 535 n.3.  In its *Shot Clock Order* in 2009, however, the FCC authoritatively construed Section 332(c)(7) "to bar State and local authorities from prohibiting the provision of services of individual carriers solely on the basis of the presence of another carrier in the jurisdiction."  *Shot Clock Order*, 24 F.C.C. Rcd. at 14017.  It did so based on the language of the statute (which uses the plural "personal wireless services" in its proscription), the possibility of "leav[ing] segments of the [local] population unserved or underserved," and consistency with the TCA's goals of "promoting the construction of nationwide wireless networks by *multiple* carriers."  *See id.* (emphasis added).  This interpretation is entitled to *Chevron* deference, given that it does not contradict the terms of an ambiguous statute and is reasonable.  *See City of Rancho Palos Verdes v. Abrams*, 544 U.S. 113, 115 (2005) (TCA's goal is "to promote competition and higher quality in American telecommunications services and to 'encourage the rapid deployment of new telecommunications technologies'") (quoting Telecommunications Act of 1996, Pub. L. No. 104-104 pmbl., 110 Stat. 56, 56); *MetroPCS, Inc. v. City & Cnty. of S.F.*, 400 F.3d 715, 732 (9th Cir. 2005) (adopting the provider-based approach because it "better facilitates the robust competition which Congress sought to encourage with the TCA, and it better accommodates the current state of the wireless services market"); *see also Second Generation Props., L.P. v. Town of Pelham*, 313 F.3d 620, 633 (1st Cir. 2002) ("[I]t is of little comfort to the customer who uses AT&T Wireless . . . who cannot get service along the significant geographic gap which may exist along Route 128 that a Cingular Wireless customer does get some service in that gap. . . . The result [of a user-based approach] would be a crazy

patchwork quilt of intermittent coverage.  That quilt might have the effect of driving the industry

toward a single carrier.").

The Board suggested in its Determination that the FCC's *Shot Clock Order* cannot trump

the Second Circuit's authoritative interpretation of the statute in *Willoth*.  (*See* Determination 11

(describing the *Shot Clock Order* as "purporting to administratively trump the federal courts").)

*Willoth*, however, did not authoritatively hold that the user-based approach applies, as the

Second Circuit later made clear.  *See Omnipoint Commcn's*, 430 F.3d at 535 n.3 (quoting *Willoth*

to the effect that the relevant service gap refers to a remote user's ability to reach a cell site, but

not stating whether that amounted to a holding that a user-based rather than a provider-based

approach applied; noting that it was unsettled whether a user-based or provider-based approach

should be used in assessing service gaps under the TCA; and declining to express an opinion on

the subject); *see also T-Mobile Ne. LLC v. Town of Ramapo*, 701 F. Supp. 2d 446, 456-57

(S.D.N.Y. 2009) (describing the divergent interpretations of *Willoth*).  Furthermore, and more

importantly, "[a] court's prior judicial construction of a statute trumps an agency construction

otherwise entitled to *Chevron* deference *only* if the prior court decision holds that its construction

follows from the unambiguous terms of the statute and thus leaves no room for agency

discretion."  *Nat'l Cable & Telecomm. Ass'n v. Brand X Internet Servs.*, 545 U.S. 967, 982

(2005) (emphasis added).  *Willoth* did not so hold; thus, the FCC's reasonable interpretation of

Section 332(c)(7) is entitled to *Chevron* deference, and I adopt it.

Because the Board's decision regarding whether the proposed DAS was "needed" was

based on a misapprehension of the law, and because under a correct understanding of the law

Plaintiff has undisputedly established that its services are "needed," this aspect of the

Determination is not supported by substantial evidence.

2.  <u>Whether the DAS is Minimally Intrusive</u>

Citing only testimony on behalf of Plaintiff that "we look to get two electronic boxes in there which basically can accommodate two carriers on the same location," (Ds' Ex. T-2 (11/30/11 hearing transcript), at 7-8), the Board concluded that the proposed DAS was not minimally intrusive pursuant to Section 285-37(A)(9)(b) of the Town's Antenna Law. (Determination 17.)  Section 285-37(A)(9)(b) requires a special permit applicant to prove to the Board that its proposed "facility is the minimum height and aesthetic intrusion necessary to provide that coverage" – here, the coverage plainly "needed" to fill MetroPCS's coverage gap. Town of Greenburgh, N.Y., Code § 285-37(A)(9)(b).  Plaintiff seemingly admitted to the Board that its proposed box is not as small as it could be because it was designed to accommodate two wireless services.  (*See* Ds' Ex. T-4 (12/14/11 hearing transcript), at 44 ("Unfortunately, this box is the smallest box that can be built, the box that accompanies the antenna, the shroud, *if it's going to be for two wireless services*.") (emphasis added).)  But the Antenna Law mandates not the minimum size necessary, but the minimum height and aesthetic intrusion necessary.  The Board did not rely on the height of the proposed antennae in denying the application; indeed, Plaintiff's proposed antennae (and mounting unit) add less than eight feet to the existing 30-foot utility poles, (*see* Determination 5-6), while the height of a more typical cell tower is around 100 feet, *see Cellular Tel. Co.*, 166 F.3d at 491 ("Height requirements vary due to local topography, but usually fall in the range of 80 [feet] – 150 [feet] above ground level.").  Nor did the Board expressly rely on the aesthetic intrusion of the shroud box; its position was only that it *could* be smaller.  The proposed box, as the Board noted, is about six feet tall, "and would extend fifteen and [one half] inches wide for about 80% of the kit's length."  (Determination 6.)  It is undisputed that the proposed box straddles the diameter of the utility pole by only about an inch on each side, protrudes from the utility pole by only a little over a foot, is 10 to 15 feet off the

ground, and is proposed to be painted the same color as the utility pole.  (*See, e.g.*, Doc. 41-1, at 8; Doc. 41-2, at 2.)[50]  While it is certainly true that "aesthetics can be a valid ground for local zoning decisions," *Cellular Tel. Co.*, 166 F.3d at 495 (citing *Suffolk Outdoor Adver. Co. v. Hulse*, 43 N.Y.2d 483, 490 (1977)), the evidence in the Board's record does not support that the size of Plaintiff's proposed shroud box correlates with aesthetic intrusion.  Indeed, the evidence from the Town's own engineering consultant shows quite the opposite:  "utility poles throughout Greenburgh and Westchester County currently accommodate cables/wiring, transformers, and utility boxes of similar – or larger – sizes," and therefore the proposed "nodes do not appear to present a significant incremental visual impact to the area."  (Ds' Eng'g Report 9.)  Given the evidence in the record that any aesthetic intrusion would be *de minimis*, *see Cal. RSA No. 4 v. Madera Cnty.*, 332 F. Supp. 2d 1291, 1294, 1309 (E.D. Cal. 2003) (describing four six-inch diameter 25-foot high poles with five-foot antennae as *de minimis* aesthetic intrusion when compared to nearby 25-foot 50,000 gallon water tank); *cf. Willoth*, 176 F.3d at 643-44 (applying *de minimis* principle to prohibition of service claim under Section 332(c)(7)), the Town's denial based on the aesthetic intrusion of a larger-than-necessary shroud box is not supported by substantial evidence in the record.  In other words, the box being bigger than strictly necessary may be a scintilla of evidence, *see Cellular Tel. Co.*, 166 F.3d at 494, but in light of the record as a whole, it is not adequate to support the Board's conclusion, *see Omnipoint Commcn's*, 202 F. Supp. 2d at 223.[51]

---

[50] These are citations to portions of Plaintiff's complete applications for a special permit.  All 20 were submitted as Exhibit 26 to the Heimdahl Declaration.  Since Exhibit 26 is lengthy (encompassing seven volumes, each of approximately 500 pages), I cite to the document number and page number as assigned by the Court's ECF system.

[51] The weakness of the Town's stated reasons, and the vociferous public opposition to the proposed DAS at the Board's hearings, mostly because of perceived health risks, raises a question as to whether the Town's stated reasons were a pretext.  (*See, e.g.*, Ds' Ex. T-2 (11/30/11 hearing transcript), at 37 ("I don't really care about how this thing looks.  I care about the fact that it is emitting radio frequencies 24 hours a day, seven days a week."); Ds' Ex. T-4 (12/14/11 hearing transcript), at 10-11 ("MetroPCS seems apparently trying to expand their coverage into our area, at our expense to our health and possibly -- well possibly our health."); *id.* at 13 (concern about "dangers of

The Board's decision, based on an incorrect statement of federal law and an insubstantial size-based rationale, was not based on substantial evidence, and therefore violates Section 332(c)(7)(B)(iii).[52]  Accordingly, Defendants Motion to Dismiss as to Plaintiff's Section 332(c)(7)(B)(iii) claim is denied, and Plaintiff's Motion for Summary Judgment as to this claim is granted.

---

radiation" and other "known and unknown dangers"); *id.* at 14 ("[R]adio frequencies, which comes [*sic*] off of cell towers, a cell antenna, even though below safety standards, have been shown to damage cellular DNA, which could lead to mutations that can cause cancer and can even be passed on to successive generations."); *id.* at 17 ("We're particularly concerned about children's health and their unique vulnerability."); *id.* at 21 ("[M]ake no mistake about it, this is microwave radiation.  It was classified as a -- to be [a] carcinogen in 2011 by the World Health Organization."); Ds' Ex. T-8 (2/7/12 hearing transcript), at 13 ("No way do I want to minimize my health concerns being so close to this, and the fact that I have lovely neighbors who have wonderful little children who will be playing in the shadow of this, and this antenna will be opposite the bedroom of my neighbor's house."); *id.* at 14 (directing the public to a website with "hundreds of studies that have been buried by the utility companies about the health problems with this type of radiation"); *id.* at 20 ("The only part that I've learned for a fact is that no real study has been done here to prove that these are safe.").)  The Town Supervisor himself voiced a concern that "people generally don't trust, you know, the government when they say it's safe," asking whether independent or "Ralph Nader type organizations" or other "groups that would normally be opposed to like anything [could] confirm the safety."   (Ds' Ex. T-2 (11/30/11 hearing transcript), at 22-23.)

The TCA is unequivocal that, to the extent the proposed facilities comply with FCC regulations, the Town is barred from denying Plaintiff's applications "on the basis of the environmental effects of radio frequency emissions."  47 U.S.C. § 332(c)(7)(B)(iv); *see Cellular Tel. Co.*, 166 F.3d at 494 ("[H]ealth concerns expressed by residents cannot constitute substantial evidence.").  The Board does not argue, nor is there any evidence in the record, that the proposed nodes will not comply with FCC regulations.  It may be that as the hearings went on, and as the Town Board and the testimony made the public aware that health and safety considerations were not proper bases for denying Plaintiff's applications under the TCA, the Board and the public sought alternative means to deny Plaintiff's applications – a "loophole," in the words of one resident.  (*See* Ds' Ex. T-4 (12/14/11 hearing transcript), at 24 ("I understand we need a loophole.  Maybe real estate prices are your loophole."); *see also id.* at 47 (Town Supervisor asking "lawyers and the environmental community to analyze the legal options" so they can have "more information as to what the Town can or cannot do"); *id.* at 56-57 (Councilman Sheehan discussing ways to deny without relying on health effects, noting it "would be terrific for us" if the public could "actually show they can have gaps in service," and "very useful" if public could "provide information to us that they do not meet those [FCC] thresholds").)

[52] The Determination also discussed NextG's merger with Crown Castle, and the extent to which it implicated Plaintiff's access to state rights-of-way as potential alternate sites for the proposed DAS.  (*See* Determination 16.)  On the one hand, this issue presents an important question – if Crown Castle has a contract to manage all state-owned real estate for wireless communications through 2018, then should it not be able to at least consider the state rights-of-way and utility poles thereon for its DAS?  On the other hand, when NextG initiated the application process, the Crown Castle merger was over two years away, and the delay in processing the application was in large part the Town's fault.  In any event, since the Board did not rely on the Crown Castle merger as a basis for denying the application – noting only that it "raises a serious question as to whether the applications are complete" and requiring an explanation "[i]f there are further proceedings before the Town Board," (*id.*) – it does not affect my analysis under Section 332(c)(7)(B)(iii).

D. Plaintiff's Remedy

Plaintiff here seeks declaratory and injunctive relief – specifically, an "order mandating or an injunction requiring that the Town grant Crown Castle such permits or other authority as is necessary to allow Crown Castle to install, operate, and maintain its facilities in the Town's public rights of way as set forth in Crown Castle's application[s]." (FAC 29.) Plaintiff does not seek compensatory damages.[53]

In the majority of cases, the appropriate remedy for a violation of Section 332(c)(7)(B)(iii) is an order requiring the locality to issue the permit sought. *See Cellular Tel. Co.*, 166 F.3d at 497 ("[T]he majority of district courts that have heard these cases have held that the appropriate remedy is injunctive relief in the form of an order to issue the relevant permits."); *T-Mobile Ne.*, 701 F. Supp. 2d at 463 (injunctive relief ordering issuance of permit appropriate for violations of Section 332(c)(7)(B)(iii)); *accord Nat'l Tower, LLC v. Plainville Zoning Bd. of Appeals*, 297 F.3d 14, 21-22 (1st Cir. 2002). In certain circumstances remand is an appropriate remedy – for example, where there was "good faith confusion by a board that has acted quite promptly," *Nat'l Tower*, 297 F.3d at 24 – but a remand to the locality runs the risk of unnecessarily delaying the process and is not appropriate where it "would serve no useful purpose," *Cellular Tel. Co.*, 166 F.3d at 497; *see Bell Atl. Mobile of Rochester L.P. v. Town of Irondequoit, N.Y.*, 848 F. Supp. 2d 391, 403 (W.D.N.Y. 2012).

This is not one of those cases where a remand would be appropriate, primarily because of the lengthy delay in processing its applications that Plaintiff has already suffered. Plaintiff first contacted the Town in 2009, and the Antenna Law process began in June 2010. After nearly a

---

[53] It is unclear whether compensatory damages would be available to remedy such violations. *See Rancho Palos Verdes*, 544 U.S. at 127 (no 42 U.S.C. § 1983 damages claim for violation of Section 332(c)(7)); *NextG Networks of NY*, 513 F.3d at 53 (same for Section 253); *see also Omnipoint Commc'ns*, 430 F.3d at 536-37 (declining to decide whether compensatory damages are available under Section 332(c)(7) directly).

year and a half of back and forth with the ARB, Plaintiff submitted its complete applications for

special permit to the Town Board on November 15, 2011.[54]  The Town Board held public

hearings on the applications on November 30, 2011, December 14, 2011, February 7, 2012,

February 29, 2012, and March 20, 2012, and did not issue its written decision denying Plaintiff's

applications until July 24, 2012 – 252 days from the submission of the complete applications.

This is well beyond presumptively-reasonable 150-day time period set by the *Shot Clock Order*,

and does not even include time spent during the completeness review, at least some of which

should arguably count towards the application processing time given that the *Shot Clock Order*

only excludes time that it takes the *applicant* to respond to requests for additional information.

*See Shot Clock Order*, 24 F.C.C. Rcd. at 14015.  The Town has proffered no real explanation as

to why its process took so long that would suffice to rebut the presumption.  Indeed, from the

close of the public hearings, it took over four months for the Town to render its decision, after

conducting public hearings on the matter for close to four months.  Further, putting the

presumption aside, the bureaucratic hoops through which Plaintiff was put, along with the rest of

the record, suggest that the Town would be no more interested in a prompt disposition now than

it was beginning in 2009.  This is a paradigmatic case where remand would only further and

unnecessarily delay the processing of Plaintiff's siting application.  Accordingly, the appropriate

remedy in equity is an order requiring the issuance of the special permits sought.[55]

---

[54] Defendants argue that the applications were not complete until December 3, 2011.  (*See* Defendants'
Memorandum of Law in Opposition to Crown Castle NG East, Inc.'s Motion for Summary Judgment and in Support
of Defendants' Cross Motion for Summary Judgment, (Doc. 53), 18.)  Although this is the date that the ARB
informed the Building Inspector that the last four of the applications were complete, the Town Board had received
copies of all the complete applications on November 15, 2011, and indeed held its first public hearing on the
applications on November 30, 2011.

[55] I express no view on whether the 20 special permits under the Town's Antenna Law are the only permits or
variances that Plaintiff requires in order to lawfully commence construction of its DAS in the Town.  Before this
Court are only Plaintiff's applications for special permits under the Town's Antenna Law, and my ruling extends
only as far as requiring the issuance of those special permits.

## IV.   **CONCLUSION**

For the foregoing reasons, Defendants' Motion to Dismiss is hereby GRANTED as to

Plaintiff's Counts I and II, and DENIED as to Count III.  Plaintiff's Motion for Summary

Judgment is hereby DENIED as moot as to Counts I and II, and GRANTED as to Count III.

Defendants are hereby ORDERED to grant Plaintiff's 20 applications for special permits

for the construction of nodes on existing utility poles in the Town of Greenburgh, (Heimdahl

Decl. Ex. 26), and issue the special permits.

The Clerk of Court is directed to terminate the pending Motions (Docs. 27, 32), and close

the case.

**SO ORDERED.**

Dated: July 3, 2013
         White Plains, New York

_____
        CATHY SEIBEL, U.S.D.J.